UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

MICHAEL JOE MCCOY,
      Petitioner,

vs.                              Case No.:  5:20cv283/TKW/EMT

MARK S. INCH,
      Respondent.
_____/

## REPORT AND RECOMMENDATION

Petitioner Michael Joe McCoy (McCoy) filed a petition for writ of habeas corpus under 28 U.S.C. § 2254 (ECF No. 1).  Respondent (the State) filed an answer and relevant portions of the state court record (ECF No. 12).  The court provided McCoy an opportunity to file a reply, and the court set a deadline for him to do so (*see* ECF Nos. 13, 15).  That deadline has passed with no response from McCoy.

The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters. *See* N.D. Fla. Loc. R. 72.2(B); *see also* 28 U.S.C. § 636(b)(1)(B)–(C) and Fed. R. Civ. P. 72(b).  After careful consideration of the issues presented by the parties, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rule 8(a), Rules Governing Section 2254 Cases.  It is

further the opinion of the undersigned that McCoy is not entitled to federal habeas relief.

I.      RELEVANT BACKGROUND AND PROCEDURAL HISTORY

The relevant aspects of the procedural background of this case are established by the state court record (*see* ECF No. 12).[1] McCoy was charged in the Circuit Court in and for Bay County, Florida, Case No. 2014-CF-390, with one count of second degree murder with a firearm (Count I) and one count of attempted second degree murder with a firearm (Count II) (ECF No. 12-1 (information)). A jury trial was held on November 17–19, 2014, at the conclusion of which the jury found McCoy guilty of the lesser included offense of manslaughter as to Count I, with specific findings that McCoy actually possessed and discharged a firearm during commission of the offense, and that discharge of the firearm resulted in death or great bodily harm to the victim (David Walker) (ECF No. 12-13 (verdict); ECF Nos. 12-2, 12-3, 12-4, 12-5, 12-6 (transcript of jury trial)). As to Count II, the jury found McCoy guilty of the lesser included offense of aggravated battery, with specific findings that McCoy actually possessed and discharged a firearm during commission of the

---

[1] Citations to the state court record and the parties' pleadings refer to the document numbers and page numbers assigned by the court's electronic filing system.

offense, and that discharge of the firearm resulted in death or great bodily harm to the victim (Susan Diane McCoy) (*id.*).

The court held a sentencing hearing on December 18, 2014 (ECF No. 12-14 (transcript of sentencing)).  The court adjudicated McCoy guilty on both Counts and sentenced him to twenty years in prison on Count I, to run consecutively to a mandatory minimum sentence of twenty-five years in prison on Count II with pre-sentence credit of 313 days (ECF No. 12-15 (judgment and sentence); ECF No. 12-14 (transcript of sentencing)).

McCoy appealed the judgment and sentence to the Florida First District Court of Appeal (First DCA), Case No. 1D14-5914 (*see* ECF Nos. 12-16, 12-17, 12-18 (parties' briefs)).  On June 21, 2016, the First DCA affirmed the conviction and sentence per curiam (ECF No. 12-19 at 1–3 (decision)).  *McCoy v. State*, 194 So. 3d 1058 (Fla. 1st DCA 2016).  The mandate issued July 7, 2016 (12-19 at 5 (mandate)). The Florida Supreme Court initially accepted jurisdiction to review the First DCA's decision, which was certified to be in direct conflict with the decision of the Fifth District Court of Appeal in *Thomas v. State*, 91 So. 3d 880 (Fla. 5th DCA 2012). *See McCoy v. State*, No. SC16-1316, 2016 WL 9454215, at *1 (Fla. Aug. 23, 2016). However, upon further consideration of the First DCA's opinion and the parties'

briefs (ECF Nos. 12-20, 12-21, 12-22, 12-23, 12-24 (parties' jurisdictional briefs and briefs on the merits)), the state supreme court subsequently exercised its discretion to discharge jurisdiction and, accordingly, dismissed review on June 8, 2017 (ECF No. 12-25 (opinion)). *McCoy v. State*, 219 So. 3d 63 (Fla. 2017) (Mem).

On January 6, 2018, McCoy filed a motion for post-conviction relief in the state circuit court, under Rule 3.850 of the Florida Rules of Criminal Procedure (ECF No. 12-26 at 10–23 (Rule 3.850 motion)). On October 5, 2018, the circuit court entered an order denying one of McCoy's two claims and set an evidentiary hearing on his remaining claim (*id.* at 47–51 (order)). The court appointed counsel for McCoy (*id.* at 68 (order appointing counsel), 80 (counsel's notice of appearance)). The evidentiary hearing was held on March 15, 2019 (*id.* at 209–51 (transcript of evidentiary hearing)). On April 1, 2019, the circuit court entered a final order denying McCoy's Rule 3.850 motion (*id.* at 92–103) (order)). McCoy appealed the decision to the First DCA, Case No. 1D19-1484 (ECF Nos. 12-27, 12-28 (parties' briefs)). On May 28, 2020, the First DCA affirmed the circuit court's decision per curiam without written opinion (ECF No. 12-29 at 1–2 (decision)). *McCoy v. State*, 296 So. 3d 388 (Fla. 1st DCA 2020) (Table). The mandate issued June 25, 2020 (*id.* at 3 (mandate)).

McCoy filed his federal habeas petition on September 15, 2020 (ECF No. 1).

## II.    STANDARD OF REVIEW

A federal court "shall not" grant a habeas corpus petition on any claim that was adjudicated on the merits in state court unless the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court."  28 U.S.C. § 2254(d)(1).  The United States Supreme Court explained the framework for § 2254 review in *Williams v. Taylor*, 529 U.S. 362 (2000).[2]  Justice O'Connor described the appropriate test:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.*, 529 U.S. at 412–13 (O'Connor, J., concurring).

---

[2] Unless otherwise noted, references to *Williams* are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367–75, 390–99); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and—except as to the footnote—Scalia) in part II (529 U.S. at 403–13).  The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

Under the *Williams* framework, the federal court must first determine the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71–72 (2003). After identifying the governing legal principle, the federal court determines whether the state court's adjudication is contrary to the clearly established Supreme Court case law. The adjudication is "contrary" only if either the reasoning or the result contradicts the relevant Supreme Court cases. *See Early v. Packer*, 537 U.S. 3, 8 (2002) ("Avoiding th[e] pitfalls [of § 2254(d)(1)] does not require citation to our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them.").

If the "contrary to" clause is not satisfied, the federal court determines whether the state court "unreasonably applied" the governing legal principle set forth in the Supreme Court's cases. The federal court defers to the state court's reasoning unless the state court's application of the legal principle was "objectively unreasonable" in light of the record before the state court. *See Williams*, 529 U.S. at 409; *Holland v. Jackson*, 542 U.S. 649, 652 (2004). "[E]ven a strong case for relief does not mean

the state court's contrary conclusion was unreasonable." *Harrington v. Richter*, 562 U.S. 86, 102 (2011).

Section 2254(d) also allows habeas relief for a claim adjudicated on the merits in state court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The "unreasonable determination of the facts" standard is implicated only to the extent the validity of the state court's ultimate conclusion is premised on unreasonable fact finding. *See Gill v. Mecusker*, 633 F.3d 1272, 1292 (11th Cir. 2011). As with the "unreasonable application" clause, the federal court applies an objective test. *See Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) (holding that a state court decision based on a factual determination "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding"). "The question under AEDPA [the Antiterrorism and Effective Death Penalty Act of 1996] is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams*, 529 U.S. at 410). AEDPA also requires federal courts to "presume the correctness of state courts'

factual findings unless applicants rebut this presumption with 'clear and convincing evidence.'" *Landrigan*, 550 U.S. at 473–74 (quoting 28 U.S.C. § 2254(e)(1)).

The Supreme Court has often emphasized that a state prisoner's burden under § 2254(d) is "difficult to meet, . . . because it was meant to be." *Richter*, 562 U.S. at 102. The Court elaborated:

> As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings. *Cf. Felker v. Turpin*, 518 U.S. 651, 664, 116 S. Ct. 2333, 135 L. Ed. 2d 827 (1996) (discussing AEDPA's "modified res judicata rule" under § 2244). It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no further. Section 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal. *Jackson v. Virginia*, 443 U.S. 307, 332, n.5, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979) (Stevens, J., concurring in judgment). As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Richter*, 562 U.S. at 102–03 (emphasis added).

A federal court may conduct an independent review of the merits of a petitioner's claim only if it first finds that the petitioner satisfied § 2254(d). *See Panetti v. Quarterman*, 551 U.S. 930, 954 (2007). Even then, the petitioner must

show that he is in custody "in violation of the Constitution or laws and treaties of the United States," *see* 28 U.S.C. § 2254(a), and that the constitutional error resulted in "actual prejudice," meaning, the error "had a substantial and injurious effect or influence in determining the jury's verdict," *see Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (internal quotation marks and citation omitted).

III.   MCCOY'S CLAIMS

   A.   **Ground One:  "Ineffective [a]ssistance of trial counsel for failing to file a pretrial motion to dismiss and require the court have [sic] a pretrial immunity hearing/for failing to have Defendant testify at such hearing; violation of the Fifth, Sixth, and Fourteenth Amendments of the United States Constitution."**

McCoy alleges defense counsel was ineffective for failing file a motion to dismiss the charges on the ground that he was immune from prosecution pursuant to Florida's "Stand Your Ground" law, Florida Statutes § 776.032 (ECF No. 1 at 5). McCoy asserts if defense counsel had filed a motion to dismiss, the court probably would have granted him immunity from prosecution (*id.*).

The State concedes that this ineffective assistance of counsel (IAC) claim was adjudicated in the Rule 3.850 proceeding and appeal (*see* ECF No. 12 at 33–40). The State contends McCoy has not demonstrated that the state court's adjudication

of the claim was based upon an unreasonable factual determination or that it was contrary to or an unreasonable application of clearly established federal law (*id.*).

### 1.    Clearly Established Federal Law

The standard for evaluating claims of ineffective assistance of counsel is set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).  To obtain relief under *Strickland*, the petitioner must show (1) deficient performance by counsel and (2) a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different.  *Id.* at 687–88.  If the petitioner fails to make a showing as to either performance or prejudice, he is not entitled to relief.  *Id.* at 697.

The court bears in mind these additional principles in applying the *Strickland* standard.  "Judicial scrutiny of counsel's performance must be highly deferential," and courts should make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."  *Strickland*, 466 U.S. at 689.  Trial counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."  *Strickland*, 466 U.S. at 690.  The burden to overcome that presumption and to show

that counsel's performance was deficient "rests squarely on the defendant." *Burt v. Titlow*, 571 U.S. 12, 22–23 (2013); *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011) ("To overcome that presumption, a defendant must show that counsel failed to act reasonably considering all the circumstances." (quotation marks and alterations omitted) ). "[T]he absence of evidence cannot overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance." *Titlow*, 571 U.S. at 23 (quotation marks and alterations omitted).

The prejudice prong requires the petitioner to show that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. In evaluating prejudice, according to *Strickland*, "a court should presume, absent challenge to the judgment on grounds of evidentiary insufficiency, that the judge or jury acted according to law. An assessment of the likelihood of a result more favorable to the defendant must exclude the possibility of arbitrariness, whimsy, caprice, 'nullification,' and the like." *Id.* In other words, "[a] defendant has no entitlement to the luck of a lawless decisionmaker." *Id.* at 695.

When a district court considers a habeas petition, the state court's findings of historical facts in the course of evaluating an ineffectiveness claim are subject to the

presumption of correctness, while the performance and prejudice components are mixed questions of law and fact. *See Strickland*, 466 U.S. at 698. "Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). "Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Richter*, 562 U.S. at 105 (citations omitted). The Supreme Court explained:

> The standards created by *Strickland* and § 2254(d) are both "highly deferential," and when the two apply in tandem, review is "doubly" so. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Id.* (citations omitted).

## 2.   Federal Review of State Court Decision

"Stand Your Ground" immunity refers to Florida Statutes § 776.032(1), which provides" that "[a] person who uses or threatens to use force as permitted in § 776.012, § 776.013, . . . is justified in such conduct and is immune from criminal prosecution . . . for the use or threatened use of such force . . . ." Fla. Stat. § 776.032 (eff. June 20, 2014).

Section 776.012 provides, in relevant part:

(2) A person is justified in using or threatening to use deadly force if he or she reasonably believes that using or threatening to use such force is necessary to prevent imminent death or great bodily harm to himself or herself or another or to prevent the imminent commission of a forcible felony.   A person who uses or threatens to use deadly force in accordance with this subsection does not have a duty to retreat and has the right to stand his or her ground if the person using or threatening to use the deadly force is not engaged in a criminal activity and is in a place where he or she has a right to be.

Fla. Stat. § 776.012(2) (2014).

Section 776.013 provides, in relevant part:

(1) A person who is in a dwelling or residence in which the person has a right to be has no duty to retreat and has the right to stand his or her ground and use or threaten to use:
. . . .
(b) Deadly force if he or she reasonably believes that using or threatening to use such force is necessary to prevent imminent death or great bodily harm to himself or herself or another or to prevent the imminent commission of a forcible felony.

(2) A person is presumed to have held a reasonable fear of imminent peril of death or great bodily harm to himself or herself or another when using or threatening to use defensive force that is intended or likely to cause death or great bodily harm to another if:

(a) The person against whom the defensive force was used or threatened was in the process of unlawfully and forcefully entering, or had unlawfully and forcibly entered, a dwelling, residence, or occupied vehicle, or if that person had removed or was attempting to remove another against that person's will from the dwelling, residence, or occupied vehicle; and

(b) The person who uses or threatens to use defensive force knew or had reason to believe that an unlawful and forcible entry or unlawful and forcible act was occurring or had occurred.

(3) The presumption set forth in subsection (2) does not apply if:

(a) The person against whom the defensive force is used or threatened has the right to be in or is a lawful resident of the dwelling, residence, or vehicle, such as an owner, lessee, or titleholder, and there is not an injunction for protection from domestic violence or a written pretrial supervision order of no contact against that person; or
. . . .
(4) A person who unlawfully and by force enters or attempts to enter a person's dwelling, residence, or occupied vehicle is presumed to be doing so with the intent to commit an unlawful act involving force or violence.

Fla. Stat. § 776.013 (2014).

When immunity under section 776.032 is properly raised by a defendant, the trial court must conduct a non-jury, pre-trial hearing to determine whether the defendant is immune from criminal prosecution. *Peterson v. State*, 983 So. 2d 27, 29 (Fla. 1st DCA 2008). The court "confront[s] and weigh[s] only factual disputes," and determines "whether the defendant has shown by a preponderance of the evidence that the immunity attaches." *Id.* at 30.

McCoy presented Ground One as Ground One of his Rule 3.850 motion (ECF No. 12-26 at 12–15). The state circuit court correctly identified the *Strickland*

standard as the applicable legal standard (*id.* at 93).  The court adjudicated the claim as follows:

<u>Ground One</u>

In Ground One, the Defendant contends trial counsel was ineffective for failing to file a pretrial motion to dismiss pursuant to section 776.032, Florida Statutes, which grants immunity to those who lawfully use force in self-defense.  The Defendant alleges that had counsel filed a pretrial motion to dismiss, he could have testified and presented evidence at a pretrial immunity hearing, outside the presence of the jury, to prove that he believed his conduct was necessary to prevent imminent death or great bodily harm to himself or his family or to prevent the imminent commission of a forcible felony.

The Defendant alleges he was prejudiced because there is a probability the Court would have believed the Defendant to have been in reasonable fear of imminent death or great bodily harm to himself or to another and granted him immunity from prosecution if counsel had filed the motion to dismiss.  The Defendant also contends counsel's deficient performance interfered with his right to testify.  He asserts he told counsel he did not want to testify in front of a jury because he has a fear of public speaking, but that he would testify during a pretrial immunity hearing before the judge because he understood the necessity of "getting out his side of the story."  He argues that because counsel failed to file a motion to dismiss and have the Defendant testify at an immunity hearing, he was essentially forced to testify during trial in the presence of the jury because there "was no other evidence that would prove Defendant's state of mind at the time of the incident."

<u>Evidentiary Hearing</u>

The Defendant's trial counsel, Ms. Kimberly Jewell, testified that the Defendant was using walking sticks, furniture, or other items to maintain his balance at the time of the shootings because he has

spinal stenosis, and that he would definitely be at a disadvantage in a physical altercation. She also testified that during her sixteen meetings with the Defendant between the time of his arrest in February and the trial in November, the Defendant's repeated assertion was that Ms. McCoy [the victim of Count II] was in the driveway with Mr. Walker [the victim of Count I], there was pushing back and forth between them, and he shot trying to protect his wife. She [defense counsel] noted that the State presented evidence at trial that Mr. Walker had left the property, an argument ensued, Mr. Walker then turned back when the Defendant made statements about having Mr. Walker's probation revoked, and Mr. Walker was 25–30 feet from the Defendant when he was shot. Ms. Jewell determined that self-defense was the only defense that was even remotely viable, and that whether or not the Defendant would testify at trial was discussed at length.

Ms. Jewell stated that the State had five statements by the Defendant (a 911 call, three statements to law enforcement, and a recorded jail call to a personal friend), and there were numerous inconsistencies in his prior statements. She noted that in one of the Defendant's statements, the Defendant was very nonchalant about shooting Mr. Walker and it was obvious he had no remorse. She also noted that the Defendant kept giving different reasons for shooting Mr. Walker, even during his direct and cross-examination at trial.

Ms. Jewell testified that she was aware of the burden for a Stand Your Ground motion for immunity at the time of the incident and the Defendant's trial, and in her legal opinion the Defendant could not meet the burden for immunity with regard to either victim. Ms. Jewell testified that the biggest problem for the defense was the Defendant's statements that he was aiming at Mr. Walker and was moving himself down the bed of the pickup truck to get a better shot because a large azalea bush was blocking his view of Mr. Walker. She noted that the evidence indicated Mr. Walker was 25–30 feet away when the Defendant shot him four times. She acknowledged that the Defendant had testified at trial that the first shot struck Ms. McCoy when he was attempting to shoot Mr. Walker, he then shot Mr. Walker, Ms. McCoy

attacked him after Mr. Walker was shot, and the second shot that struck Ms. McCoy was fired in self-defense.  Ms. Jewell testified that when making a decision on whether to file a pretrial motion for immunity, she had:  (i) Ms. McCoy's deposition testimony that the Defendant first shot Mr. Walker and then turned and shot her twice in the stomach; (ii) evidence that Ms. McCoy was in fact shot twice in the stomach; and (iii) evidence of the events leading up to the shootings.  She expressed that based on this evidence and the Defendant's various statements in the hours and days after the shootings, she did not believe a Stand Your Ground motion with regard to either victim would be successful.

Ms. Jewell testified that her decision to not file the pretrial motion was made for the strategic purpose of avoiding having to address at trial a sixth statement by the Defendant (his testimony at a pretrial hearing for immunity).  She stated that she was of the opinion that testifying at a pretrial hearing would be very detrimental to the Defendant in light of her opinion that the motion would not be successful.  From a strategic standpoint, she did not want a statement by the Defendant outside of his prior statements that were clustered in a short timeframe near the time of the incident (one of which may have been made while the Defendant was hospitalized pursuant to a Baker Act petition), because she determined that one way to address the inconsistencies in those prior statements was to say he was still in shock when statements were made in the hours and days following the shootings.

The Defendant testified that he told defense counsel a few weeks before his trial date that he wanted to have a pretrial hearing on immunity and Ms. Jewell's response to him was that it was too late.  He testified that he told Ms. Jewell that he shot Mr. Walker because he thought Mr. Walker was attacking Ms. McCoy and that he shot Ms. McCoy because she was attacking him.  He also testified that defense counsel never told him a stand your ground motion was meritless, but acknowledged that defense counsel told him that a stand your ground pretrial hearing would "mess up her strategy."  On cross-examination,

the Defendant was asked if his story regarding what happened that night changed several times. The Defendant testified his story of why he shot Mr. Walker did not change—all of those reasons "lined up": (i) he was protecting himself; (ii) Mr. Walker did come back onto his property and was pushing Ms. McCoy; and (iii) his statement during his 911 call that he shot Mr. Walker because Mr. Walker and Ms. McCoy were cheating on him was a true statement.

<u>Analysis</u>

The Court finds that Ground One is due to be denied. Based on the testimony of Ms. Jewell at the evidentiary hearing, the Court finds that defense counsel considered whether to file a pretrial motion for immunity and made a reasonable strategic decision not to file the motion based on the evidence and the burden and quantum of proof at that time. See Gregory v. State, 224 So. 3d 719, 731 (Fla. 2017) ("'[S]trategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct.' Occhicone v. State, 768 So. 2d 1037, 1048 (Fla. 2000)."). See also Bretherick v. State, 170 So. 3d 766 (Fla. 2015) (holding the burden of proof was on the defendant to demonstrate by a preponderance of the evidence an entitlement to the Stand Your Ground immunity at the pretrial evidentiary hearing).

Assuming counsel's failure to file the pretrial motion for immunity constituted deficient performance, the Defendant cannot establish prejudice based on the record before the Court. At trial, Deputy Jason Larson testified that when he arrived at the scene at 2:38 a.m., he observed an individual [Mr. Walker] laying [sic] in a ditch or near a ditch in front of the house, and two people [Defendant and Ms. McCoy] closer to the house behind some vehicles. He ordered the Defendant to the ground and began handcuffing him. As he was picking the Defendant up and taking him to the patrol car, the Defendant said he did not mean to shoot his wife. (Tr., pp. 25–27.)

Stephanie Wargo, a crime scene investigator for the Bay County Sheriff's Office, testified that she located five shell casings on the north side of an azalea bush, and a sixth near the back bumper of the Nissan truck, with shell casings found five feet, seven feet, and nine feet from the bumper of the truck. (Tr., pp. 78–79.) She testified that the distance from the bumper of the truck to Mr. Walker's feet was approximately 23 feet, and the distance from the area between the two vehicles to the area on the ground where Ms. McCoy's blood and Ms. McCoy's cell phone were located was approximately six feet. (Tr., pp. 78–80.) In the Defendant's bedroom, she located the handgun that was determined to have been used in the shootings. (Tr., p. 71.)

Ms. McCoy testified that the Defendant is disabled due to back and neck problems and used forearm crutches or a cane to assist in walking, but he could ambulate with just one of the forearm crutches, could walk for short distances without any assistance, and was not in a wheelchair at the time of the shootings. (Tr., pp. 93–94.) She stated that she and the Defendant had been having marital problems and had agreed toward the end of 2013 that they would be separated but that she and her daughter would stay until her daughter completed the school year; after receiving their tax refund, she would file for divorce and she and her daughter would move back to Alabama. (Tr., pp. 95–96.) She also testified that she and the Defendant continued to sleep in the same bedroom because the only sources of heat in the house were electric heaters in the bedrooms. (Tr., p. 96.) She testified that she had met Mr. Walker when she went to Haney in 2010, and they became good friends. (Tr. 97.) She stated that she and Mr. Walker reconnected around the first part of October on Facebook, and she began to visit him at his mother's house. (Tr., pp. 99–99 [sic].) In November and December, they got very close and started seeing each other more often. (Tr. 99.)

Ms. McCoy testified in February, there was an incident and Mr. Walker could no longer stay at his mother's house; he had nowhere to go at that time and the Defendant offered to let Mr. Walker stay at their house. (Tr., p. 99.) She asserted the Defendant was aware before this

time that she had been visiting Mr. Walker at his mother's house, and he was fine with that. (Tr., p. 100.) Mr. Walker moved into the home on Sunday, February 2. Ms. McCoy stated things were fine the first couple of days; the Defendant and Mr. Walker would sit around the table and talk, and the Defendant agreed to sell Mr. Walker a red truck. (Tr., p. 101.) On Tuesday, February 4, Mr. Walker went to work that morning as far as she knows, and she left to go to work shortly after 2 p.m. She acknowledged that by this time, she and Mr. Walker were "more than friends." (Tr., pp. 101–02.) When she got home at approximately 11:45 p.m., the Defendant and Mr. Walker were sitting at the table talking. (Tr., p. 103.) She sat with them, and she and Mr. Walker began texting. The Defendant then suddenly got up and went to the bedroom; she could tell he was mad, so she followed and asked what was wrong. He was getting a pistol box out from under the bed. (Tr., pp. 103–04.) The Defendant was angry that she and Mr. Walker had been texting and started talking about shooting himself. She stated she tried to get the gun and they ended up wrestling for the gun, but she quit after the Defendant bit her. (Tr., pp. 104–06.) She testified that the Defendant then got the gun, turned it on her, and told her to go to the living room. (Tr., pp. 106–07.) She testified the Defendant made her sit in the living room for awhile; [sic] every time she started to get up, he would point the gun toward her daughter's room and tell her she better sit down because she had a little girl in there; he had a blank furious look on his face. (Tr., p. 111.) After 15–20 minutes, he started to settle down a bit and wanted to go outside, so they sat on the tailgate of the red truck. (Tr., p. 112.)

Ms. McCoy testified that the Defendant began talking about wanting to work things out in the marriage. He then said he wanted Mr. Walker to leave that night, and told her to go in and tell Mr. Walker to leave; she supposed Mr. Walker had overheard because Mr. Walker met her at the door as she started to go in. (Tr., pp. 112–13.) Ms. McCoy testified that Mr. Walker came down the steps, walked around the front of the truck and out to the ditch, and started walking down the side of the road. When Mr. Walker was out at the mailbox area, the Defendant started yelling and cursing at Mr. Walker. In response, she testified that

Mr. Walker turned around and said he was leaving. Ms. McCoy testified that at that point, the Defendant said "you know what, you son of a, and he stands up and he just open fires on David." (Tr., pp. 113–14.) She testified that she was off to the left of the Defendant, probably 25–30 feet from Mr. Walker, when the Defendant began firing at Mr. Walker, and that when the Defendant pulled the gun out and stood up, she had started backing up and was yelling, "No, don't do it." She also testified that after the Defendant shot Mr. Walker, he turned to her and shot her twice in the stomach. (Tr., pp. 114–15.) She also testified that Mr. Walker did not make an aggressive move toward the Defendant and that she and Mr. Walker never got into a pushing match before the Defendant fired shots. (Tr., p. 117.) Instead, she testified that after she talked to Mr. Walker on the porch and told him that he had to leave, she "walked back around this way, and come over here back because Mike was sitting here on the tailgate so I had come back around to this side and was standing over here." (Tr., pp. 117–18.) She testified that she was probably 10 feet away from the Defendant when he shot her and that she did not attack the Defendant after he shot Mr. Walker; instead, the Defendant shot Mr. Walker and then shot her. (Tr., pp. 118–19.) She stated the Defendant went into the house as soon as she was shot. (Tr., p. 121.) The Defendant then came back outside with the house phone, kneeled down where she was, and called 911 and told them he had just shot two people. (Tr., pp. 121–22.)

Ms. McCoy, as well as Ms. McCoy's father, daughter and son, testified at trial that prior to this incident, the Defendant had bragged about being able to shoot someone and get away with it by claiming he is disabled and was threatened. (Tr., pp. 125; 170; 176; 183–84.)

Sheriff's Investigator Craig Romans testified that when he arrived at the scene at 3:15 a.m., Deputy Larson told him that on the way to the scene the dispatcher reported that a male individual called in and claimed he had shot his wife and her friend because they were cheating on him. (Tr. 208.) In the February 5, 2014 911 call placed by the Defendant, which was published to the jury, the following exchange occurred:

Q.  Sheriff's Office, 911, what is your emergency?

A.  Um, I shot two people.

Q.  You just shot two people?

A.  Are you there?

Q.  I am here.  You said you just shot two people, sir?

A.  Yes, yes, yes, I did.

Q.  Okay.  Who are these people that you shot?

A. . . . just come right quick.

Q.  Sir, okay, who are you?

A.  I am Mike McCoy, come, come quick.  It's 8505 Rhonda Road.

Q.  Okay, we have people coming.  Why did you shoot them, sir?

A.  They were cheating on me, my wife and a wife [sic].  Hurry, hurry, hurry, hurry.

Q.  Okay.

A.  What do I need to do?

Q.  Are they still breathing?

A.  One is.

Q.  Which one is breathing?

A.  My wife.  Hurry up.

Q.  Okay.  Where is the gun, sir?

A.  I put it in the house.

Q.  Where in the house?

A.  Are you okay?

Q.  Where in the house, sir?

A.  It's in the room, it's in the room.

Q.  In which room?

A.  It's unloaded.  Hurry up.  I am outside.  I am outside. She's okay.

Q.  You are outside?

A.  I am outside.  I shot my wife and her boyfriend. Hurry up.

Q.  Sir, we have them coming as fast as they can but I have  questions I have to ask you.

A.  Okay.  Ask me.  She's breathing.  I don't know about him.

Q.  Okay.  I do have them coming to you.  I need you to stay on the line with me.
. . . .

Q.  Okay.  Who is the male?

A.  David Walker.

Q.  David Walker?

A.  Yes.

Q.  Is the male breathing?

A.  I am not even going to go check him, I don't give a shit about him.

Q.  So David is in the house?

A.  No David is in the ditch, okay, he started talking crap to me . . . so coming over there to me.[FN 1]

Q.  Okay, so David is outside in a ditch?

A.  Yes, yes.  Well, me and my wife was outside talking her and her boyfriend's relationship and I told him to get out of my house because he was sitting, [sic] I was being nice letting this guy live at my house because he was in trouble and it happened to be my girlfriend's boyfriend, okay—I mean, my wife's boyfriend, okay, and I was sitting at table [sic].  They were, them [sic] two was drinking, I wasn't drinking, and they were texting back and forth to each other, okay, which I didn't, you know, I didn't, didn't know, and, you know, I kind of got the message later and when it was time to go to the room, I asked my wife about it and she told me it's been going on for about a month,  okay, and I told her to get him out of my f---ing house, okay—

Q.  Okay.

A.  —that he wasn't going to stay here and she went and told him and he was going to leave in the morning and I was sitting outside with the gun and told him, you know, he started walking out and said he was leaving this place, getting a taxi, and I told him that, you know, to leave and he started talking shit to me, and I told him no, I would damn shoot his ass, and, you know, Diane got in front of us, you know, and I started f---ing shooting and she got hit and he got hit.

Q.  Okay.  Where are the[ir] wounds, where did you she get hit?

A.  Diane is in the stomach.

Q.  Diane got shot in the stomach.

A.  Where else Diane?

The Victim:  Leg.

A.  In her leg, got shot in the leg.

Q.  Do you know where you shot David?

A.  No, I don't.

Q.  Okay.  Is that her that I can hear in the background?

A.  Yeah, that's her, you can hear her.  I guess I will be going to prison, huh?

Q.  I don't know.  What kind of weapon did you use, sir?

A.  It's a 9-millimeter.

Q.  9-millimeter?

A.  Every bullet was fired

Q.  How many does it hold?

A.  I don't know, nine.

Q.  Nine shots?

A.  Yes.  Yeah, I got him with all of them but two.  I think, I might have missed.

Q.  Okay.  So you said the 9-millimeter, you said it's in the house, right?

A.  Yeah, it's in the house, it's um, um, not, you know, there's, it's you know, all of the bullets it chambers itself off.  It's sitting over there by my nightstand.
. . . .

A.  I didn't mean to shoot Diane, you know.

Q.  Okay.

A.  But I did mean to shoot David.

Q.  Okay.

(Tr., pp. 216–23.)

The State also introduced phone calls placed from the jail by the Defendant on February 15, 2014, to his friend Allen Wilson:

Defendant:  What is she saying, you know, my bad—

Allen:  You probably don't want me to say what she said over the phone because you can't talk about that shit, man, but it's nothing what you said.

Defendant:  I know it's nothing what I said because she is trying to protect her stuff.

Allen:  I can tell you this much, as long as the ballistics don't match up or anything, you are all right.

Defendant:  What ballistics?

Allen:  As far as maybe where the gun shells fell.

Defendant:  Huh?

Allen:  And how far away the people were.

Defendant:  Everything matches up for both of us. Exactly.

Allen:  Man, I could tell you exactly what she said, if you want me to.

Defendant:  I am not, you know, I am not upset with anybody or anything like that, I mean, I am not mad at her for putting me in here, okay, but I just, you know, but I don't want, you know, I don't want to be here for the rest of my life, you know what I am saying?

Allen:  Well, in the long run, Mike, only you all two knows what happened but if the police go by her story, you are going to be there for awhile [sic].

Defendant:  Well—

Allen:  I ain't [sic] going to steer you wrong or shoot you wrong or anything, man, but there's two totally different versions here, man . . . .
. . . .

Defendant:  No.  My problem that I have got, okay, is I couldn't remember exactly where that, you know, certain spot was, you know what I am saying?  And which my lawyer told me, you know, that's got to be it then.  That's what they were doing with her, you know, I said everything she said, yeah, that, that was true, that's true, that was true, that was true.  You know what I'm saying?

Allen:  Right.

Defendant:  So that, and when it came back, you know, when I messed up, and it came back around, that, they gave me a chance to fix it, so I fixed it and now everything's all right, you know.

Allen: What do you mean you fixed it?

Defendant:  I told them that it happened there, you now, you know where I did it.

Allen:  Is that the same thing you told me from the get-go?
. . . .

Defendant:  No, no.  That's where the mess up was, you know.  Actually I had to turn it all the ways over to the left, you know, almost to the left, you know.
. . . .

Defendant:  Right, that's what happened. I turned, I had to tum [sic] all the ways to the left, but that's where

she was coming up at me at, you know, and I, you know, she was coming to get me, you know, and she was mad. She should have been calling 911 and getting her daughter out of there, you know.  But she wasn't.  She was, you know what I'm saying?[FN 2]

. . . .

    Allen:  That looks real bad on you making that turn.

    Defendant:  No, it doesn't, how you figure that?

    Allen:  It's just—

    Defendant:  She was coming at me.

    Allen:  Yeah, but it's going to boil down to your word against hers.  I don't really know whether I can talk to you about or not on the phone.

    Defendant:  Well, you're not allowed to talk about anything, is what I am saying is, mean [sic], I am handicapped, okay?

    Allen:  Right.

    Defendant:  Doctors think if you, your little kid, Seth, could hit me in the back and would be paralyzed from the spot down—

    Allen:  I see what you are saying.

    Defendant:  I have six spots from my neck all the way down—

    Voice:  I follow exactly what you said.

Defendant:  If am f---ing hit then and the law [sic], it's called stand your ground law—

Allen:  Stand your ground law, yeah.

. . . .

Defendant:  I am not being bull dogged, tackled, and paralyzed for the rest of my life.

. . . .

Defendant:  Yeah. So I am sorry that happened but I have to look out for me.

. . . .

Defendant: You know and, you know, the other guy walked all the way off the property, okay, all the way.

[call was terminated]

Defendant:  My bad.  Anyway, the guy walked all the way off the property and then started coming back, okay?  And I don't care if it was 20 foot or 30 foot. It doesn't matter, you know.  Once, once he puts his foot back on my property, you know, after I told him not to come back —

Allen:  Right.

Defendant:  —you know, and he was still coming anyway—

Allen:  Right.

Defendant:  He was pushing Diane out of the way so I could have waited for him to get five [sic], I am not going to do that, you know.

Allen:  Right.

(Tr., pp. 225, 229–42.)

Dr. Michael Hunter, the medical examiner, testified that Mr. Walker had five separate gunshot wounds, but Dr. Hunter could not determine which shot occurred first.  (Tr. 255–62.)  He could surmise two of the gunshots would be consistent with Mr. Walker facing or partially facing whoever was shooting him; the other two, particularly the one in the left flank, would be consistent with Mr. Walker moving away or turning away from the shooter.  (Tr. 263–64.)

At the time of the Defendant's trial, the burden of proof was on the defendant to demonstrate by a preponderance of the evidence an entitlement to the Stand Your Ground immunity at the pretrial evidentiary hearing.  Bretherick v. State, 170 So. 3d 766 (Fla. 2015).  Subsequently, the Florida Legislature enacted section 776.032(4), Florida Statutes, which provides that "[i]n a criminal prosecution, once a prima facie claim of self-defense immunity from criminal prosecution has been raised by the defendant at a pretrial immunity hearing, the burden of proof by clear and convincing evidence is on the party seeking to overcome the immunity from criminal prosecution provided in subsection (1)."  Based on the evidence presented at trial, the Court finds no reasonable probability that the outcome of the proceeding would have been different or that the Court would have determined the Defendant was entitled to immunity pursuant to section 776.032 under the burden and quantum of proof of either Bretherick or section 776.032( 4), Florida Statutes.

[FN 1:  Ellipsis in the original transcript.  (Tr. p. 219.)]

[FN 2:  Although not relied on in denying relief on Ground One, the Court notes that the Defendant's statement in the phone call with Mr. Allen that Ms. McCoy was "coming to get me" is not consistent with portions of his trial testimony regarding shooting Ms. McCoy and when he remembered that Ms. McCoy had attacked him.  When cross-examined during trial, the Defendant was asked

about his statement to the 911 operator that he did not mean to shoot Ms. McCoy and whether that statement was truthful. The Defendant responded, "It was the truth. I didn't mean to shoot her. The first shot I didn't mean to shoot. I didn't remember the second shot until three months later, the second one." He also testified that he did not remember being hit himself. (Tr., pp. 399; 403; 407; 414–15.) The Defendant also testified at trial that Ms. McCoy was approximately 20 feet from him, near Mr. Walker, when the first shot hit her and he acknowledged that he was asking the jury to believe that the first shot accidentally hit Ms. McCoy while he was trying to protect her from Mr. Walker, he then fired four shots at Mr. Walker, Ms. McCoy then moved 20 feet from where the first shot struck her to where he was and physically attacked him, and he purposefully shot her a second time in self-defense. (Tr., pp. 400–01.) With regard to his statement to Mr. Allen about turning to the left and shooting Ms. McCoy, the Defendant testified at trial that Ms. McCoy "did come from the left. That was, listen, that was when I thought she was crossing. That is when I was in distress, when I don't remember. I thought she was crossing. She didn't get shot crossing. I thought she was shot crossing. That's what I told Mr. Romans, I thought she was shot crossing. She was not shot crossing. I shot her right here on accident and then I thought I shot her when she was crossing because I couldn't remember that she jumped on me." (Tr., p. 418.)

(ECF No. 12-26 at 93–102).

The First DCA affirmed the circuit court's denial of McCoy's IAC claim in a one-word decision, "Affirmed." *McCoy v. State*, 296 So. 3d 388 (Fla. 1st DCA 2020) (Table).

The First DCA's summary affirmance is an "adjudication on the merits" entitled to deference under 28 U.S.C. § 2254(d). *See Richter*, 562 U.S. at 99, 100. Consistent with *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018), this court "look[s] through" the First DCA's unexplained decision to the circuit court's order denying postconviction relief, and presumes that the First DCA adopted the same reasoning. *Wilson*, 138 S. Ct. at 1192.

Undertaking the § 2254(d)(2) inquiry first, and applying that deferential standard of review, the undersigned cannot conclude that the state court's factual finding that defense counsel made a strategic decision not to file a motion to dismiss was an unreasonable determination of fact in light of the evidence presented in state court. *See DeBruce v. Comm'r, Ala. Dep't of Corr.*, 758 F.3d 1263, 1273 (11th Cir. 2014) (stating that a question "regarding whether an attorney's decision is 'strategic' or 'tactical' is a question of fact."). Defense counsel's testimony at the post-conviction evidentiary hearing amply supports the state court's factual finding (*see* ECF No. 12-26 at 212–34). Therefore, McCoy has not satisfied § 2254(d)(2).

Second, the court undertakes the § 2254(d)(1) inquiry—whether the state court decision involved an unreasonable application of *Strickland*. Under this inquiry, the court must determine whether a fairminded jurist could agree with the

state court's conclusion that (1) defense counsel's strategic decision was reasonable (i.e., that counsel's decision was not deficient), and/or (2) McCoy failed to demonstrate he was prejudiced by counsel's decision.

Although an IAC claim is a federal constitutional claim which the court considers in light of the clearly established law of *Strickland*, when the validity of the claim that counsel failed to assert is clearly a question of state law, the federal habeas court must defer to the state's construction of its own law. *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("[The United States Supreme Court has] repeatedly held that a state court's interpretation of state law . . . binds a federal court sitting in habeas corpus."); *Pinkney v. Sec'y, DOC*, 876 F.3d 1290, 1295 (11th Cir. 2017) ("[A]lthough 'the issue of ineffective assistance—even when based on the failure of counsel to raise a state law claim—is one of constitutional dimension,' [a federal court] 'must defer to the state's construction of its own law' when the validity of the claim that . . . counsel failed to raise turns on state law." (quoting *Alvord v. Wainwright*, 725 F.2d 1282, 1291 (11th Cir. 1984))); *Callahan v. Campbell*, 427 F.3d 897, 932 (11th Cir. 2005) (holding that defense counsel cannot be deemed ineffective for failing to make a state-law-based objection when the state court has already concluded that the objection would have been overruled under state law; to

conclude otherwise would require the federal habeas court to make a determination that the state court misinterpreted state law, which would violate the fundamental principle that federal habeas courts should not second-guess state courts on matters of state law); *Herring v. Sec'y Dep't of Corr.*, 397 F.3d 1338, 1354–55 (11th Cir. 2005) (denying federal habeas relief on ineffective assistance claim based on counsel's failure to make state law-based objection; holding that the Florida Supreme Court's conclusion that the proposed objection would have been overruled was binding and precluded federal habeas relief on the ineffective assistance claim: "The Florida Supreme Court already has told us how the issues would have been resolved under Florida state law had [petitioner's counsel] done what [petitioner] argues he should have done . . . .  It is a 'fundamental principle that state courts are the final arbiters of state law, and federal habeas courts should not second-guess them on such matters.'") (alterations in original) (quoting *Agan v. Vaughn*, 119 F.3d 1538, 1549 (11th Cir. 1997)).

Here, the state court already answered the question of whether a motion to dismiss, based upon "Stand Your Ground" immunity, would have been successful under Florida law—it would not have been.  This court must defer to the state court's determination of state law.  Defense counsel's failure to file a motion to dismiss

cannot be deemed deficient performance, and McCoy cannot show he was prejudiced by counsel's failure to raise the immunity issue in a motion to dismiss, because the motion had no arguable basis for success. *See, e.g., Lewis v. Sec'y, Dep't of Corr.*, No. 2:19cv449-LES-MRM, 2021 WL 2712367, at \*7–8 (M.D. Fla. July 1, 2021) (deferring to the state court's determination that petitioner could not have shown entitlement to Stand Your Ground Immunity under Florida law, and holding that, based upon this application of Florida law, the state court reasonably concluded that defense counsel's failure to request a Stand Your Ground hearing was reasonable and did not prejudice petitioner) (cited as persuasive authority); *Smith v. Sec'y, Dep't of Corr.*, No. 8:18cv0049-KKM-SPF, 2021 WL 1214948, at \*8–9 (M.D. Fla. Mar. 31, 2021) (same); *Briner v. Sec'y, Dep't of Corr.*, No. 6:15cv1117-Orl-40TBS, 2018 WL 560609, at \*3–4 (M.D. Fla. Jan. 25, 2018) (same).

Based on the record, a fairminded jurist could agree with the state court's determination that defense counsel's strategic decision not to file a motion to dismiss based on statutory immunity fell within the wide range of reasonable professional assistance. A fairminded jurist could also agree with the state court's conclusion

that McCoy failed to establish a reasonable probability of a different outcome if defense counsel had filed the motion to dismiss.

McCoy has not established that the state court's adjudication of Ground One was based upon an unreasonable determination of fact or that it was contrary to or an unreasonable application of *Strickland*. Therefore, McCoy is not entitled to habeas relief on Ground One.

**B.    Ground Two: "Ineffective [a]ssistance of counsel pursuant to the Sixth Amendment of the United States Constitution."**

McCoy alleges defense counsel was ineffective for failing to object to the trial court's jury instructions on the lesser included offenses on Count II, specifically, the court's instructing the jury on the least severe offense first (i.e., attempted manslaughter, which is a third degree felony) and then the second-least severe offense (i.e., aggravated battery, a second degree felony) (ECF No. 1 at 7). McCoy asserts the jury could have assumed that the charges were listed from most serious to least serious (in the jury instructions and the verdict form) (*id.*). McCoy asserts the jury could have been attempting to convict him of the least serious offense, and because of the failure to list the offenses in descending order, the jury "was unable to effectively exercise its 'pardon power'" (*id.*).

The State concedes that this claim was adjudicated in the Rule 3.850 proceeding and appeal (*see* ECF No. 12 at 41–45).  The State contends McCoy has not demonstrated that the state court's adjudication of the claim was based upon an unreasonable factual determination or that it was contrary to or an unreasonable application of clearly established federal law (*id.*).

### 1.   Clearly Established Federal Law

The *Strickland* standard, set forth *supra*, governs this claim.

### 2.   Federal Review of State Court Decision

McCoy presented Ground Two as Ground Two of his Rule 3.850 motion (ECF No. 12-26 at 16–20).  The state circuit court adjudicated the claim as follows:

> In his second ground for relief, the Defendant argues that his trial counsel was ineffective for failing to object to the Court instructing the jury on the third-degree felony, Attempted Manslaughter, before instructing the jury on the second-degree felony, Aggravated Battery, and to listing Attempted Manslaughter before Aggravated Battery on the verdict form.  The Defendant argues that the jury could have assumed that the charges were listed from most serious at the top to least serious at the bottom, and that the jury could have been attempting to convict him of the least serious offense.  While the Defendant does not directly characterize it as such, the Court recognizes the Defendant's argument as essentially being that the jury was unable to effectively exercise its "pardon power."

> The Defendant also acknowledges that he raised this same issue on direct appeal, but claims that counsel's failure to object caused the

appellate court to review the jury instructions on a heightened standard of fundamental error, thereby prejudicing the appeal against him.

The State responds by arguing first that the Defendant cannot raise this claim in a motion for postconviction relief, because he has already done so unsuccessfully on appeal.[FN 1]   Second, the State argues that, even assuming error, the Defendant cannot demonstrate prejudice, as that would require an assumption that the jury would have found differently if the verdict form were ordered differently, which would require the jury to depart from the law in reaching its verdict.

In this instance, it is unnecessary for the Court to determine whether the Defendant has established deficient performance by his trial counsel, as the Defendant has failed to establish prejudice.  Even assuming for the sake of argument that counsel was ineffective for failing to object to Attempted Manslaughter being instructed—and listed on the verdict form—before Aggravated Battery, the Defendant cannot establish a reasonable probability that the jury would have found the Defendant guilty of Attempted Manslaughter instead.  *Cf.* Sanders v. State, 946 So. 3d 953, 959-60 (Fla. 2006) ("[W]e, too, 'have difficulty accepting the proposition that there is even a substantial *possibility* that a jury which has found every element of an offense proved beyond a reasonable doubt, would have, given the opportunity, ignored its own findings of fact and the trial court's instruction on the law and found a defendant guilty of only a lesser included offense.'" (emphasis in original)); Haliburton v. State, 7 So. 3d 601, 606 (Fla. 4th DCA 2009) ("The instruction's potential effect on the jury's 'pardon power' is speculative and not grounds for relief in a postconviction motion."); James v. State, 973 So. 2d 528, 529 (Fla. 5th DCA 2007) ("Therefore, an ineffective assistance of counsel claim may be summarily denied if the only allegation of prejudice is that the jury was unable to exercise its pardon power.").

The Defendant's argument that he would have—but for counsel's failure to preserve the issue by objecting—succeeded in challenging the jury's instructions on appeal is also unconvincing.

"The prejudice in counsel's deficient performance is assessed based upon its effect on the results at trial, not on its effect on appeal." <u>Strobridge v. State</u>, l So. 3d 1240, 1242 (Fla. 4th DCA 2009) (citing <u>Carratelli v. State</u>, 961 So. 2d 312, 323 (Fla. 2007)); <u>Bradley v. State</u>, 33 So. 3d 664, 683 n.20 (Fla. 2010) ("We note that under <u>Strickland</u> the focus of the inquiry is on the proceeding in which the alleged error occurred."); <u>Pryear v. State</u>, 243 So. 3d 479, 482 (Fla. 1st DCA 2018). Accordingly, the Defendant's Motion is due to be denied as to this ground.

> [FN 1: The Court notes that this argument is misplaced. The Defendant is raising a claim of ineffective assistance of counsel, not challenging the instruction directly as he would have done on appeal.]

(ECF Non. 12-26 at 49–50). As previously noted, the First DCA affirmed the circuit court's decision without stating its reasons.

The state court's rejection of McCoy's claim is consistent with *Strickland*'s prejudice standard. Under *Strickland*, a court must presume that the jury acted according to the law:

> In making the determination whether the specified errors resulted in the required prejudice, a court should presume, absent challenge to the judgment on grounds of evidentiary insufficiency, that the judge or jury acted according to law. An assessment of the likelihood of a result more favorable to the defendant must exclude the possibility of arbitrariness, whimsy, caprice, "nullification," and the like. A defendant has no entitlement to the luck of a lawless decisionmaker, even if a lawless decision cannot be reviewed. The assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision. It should not depend on the idiosyncracies [sic] of

the particular decisionmaker, such as unusual propensities toward harshness or leniency.

466 U.S. at 694–95.

Under Florida law, a jury must "render a true verdict according to the law and the evidence." *Sanders v. State*, 946 So. 3d 953, 958 (Fla. 2006). *Strickland* requires that this court assume that the jury in McCoy's trial followed this rule of law. *See Strickland*, 466 U.S. at 694 ("[A] court should presume, absent challenge to the judgment on grounds of evidentiary insufficiency, that the judge or jury acted according to law.").[3]

The jury in McCoy's trial was instructed as follows with respect to Count II:

> As to Count II, Attempted Murder in the Second Degree includes the lesser crimes of Attempted Manslaughter, and Aggravated Battery, all of which are unlawful.
> . . . .
> If you find that there was an attempted homicide of Susan Diane McCoy by Michael Joe McCoy, you will then consider the circumstances surrounding the attempted homicide in deciding whether it was Attempted Second Degree Murder, or Attempted Manslaughter, or Aggravated Battery, or whether the attempted homicide was excusable or resulted from justifiable use of deadly force.
> . . . .
> In considering the evidence, you should consider the possibility that although the evidence may not convince you that the defendant committed the main crime of which he is accused, there may be evidence that he committed other acts that would constitute a lesser

---

[3] McCoy does not claim that there was insufficient evidence to support his conviction for aggravated battery with a firearm on Count II.

included crime.  Therefore, if you decide that the main accusation has not been proven beyond a reasonable doubt, you will next need to decide if the defendant is guilty of any lesser included crime.  The lesser included crimes indicated in the definition of Attempted Second Degree Murder are Attempted Manslaughter and Aggravated Battery.

To prove the crime of Attempted Manslaughter, the State must prove the following element beyond a reasonable doubt:

Michael Joe McCoy intentionally committed an act which would have resulted in the death of Susan Diane McCoy except that someone prevented Michael Joe McCoy from killing Susan Diane McCoy or he failed to do so.

However, the defendant cannot be guilty of Attempted Manslaughter by committing a merely negligent act.

Each of us has a duty to act reasonably and use ordinary care toward others.  If there is a violation of that duty, without any conscious intention to harm, that violation is negligence.  It is not an attempt to commit Manslaughter if the defendant abandoned the attempt to commit the offense or otherwise prevented its commission under circumstances indicating a complete and voluntary renunciation of his criminal purpose.

In order to convict of Attempted Manslaughter it is not necessary for the State to prove that the defendant had an intent to cause death, only an intent to commit an act which would have caused death and was not justifiable or excusable attempted homicide, as I have previously explained those terms.

To prove the crime of Aggravated Battery, the State must prove the following two elements beyond a reasonable doubt.  The first element is a definition of battery.

> 1.    Michael Joe McCoy intentionally caused bodily harm to Susan Diane McCoy.
>
> 2.    Michael Joe McCoy in committing the battery used a deadly weapon.

(ECF No. 12-12 at 12, 16–18 (jury instructions)).

The jury found McCoy guilty of Aggravated Battery (*see* ECF No. 12-26 at 52–53 (verdict)).  In finding him guilty of that offense, the jury concluded that the evidence proved beyond a reasonable doubt that McCoy intentionally caused bodily harm to Susan McCoy, and he used a deadly weapon while doing so.  Even if the lesser included offenses had been re-ordered in the jury instructions and on the verdict form, the jury would not have been permitted to convict McCoy of Attempted Manslaughter, as McCoy speculates, because it had concluded that the evidence established he was guilty of the more serious offense of Aggravated Battery.

McCoy's assertion of prejudice depends, as he admits, on the possibility that the jury would have exercised their "pardon power" (*see* ECF No. 1 at 7).  But as previously discussed, McCoy is not entitled to the "luck of a lawless decisionmaker," which is essentially all that he seeks, so the state court reasonably concluded that he had no recourse under *Strickland*.

The state court also reasonably rejected McCoy's argument that counsel's failure to object prejudiced him on direct appeal because it caused the First DCA to review his claim for fundamental error as opposed to harmless error. *See Purvis v. Crosby*, 451 F.3d 734, 739 (11th Cir. 2006) ("The Supreme Court in *Strickland* told us that when the claimed error of counsel occurred at the guilt stage of a trial (instead of on appeal) we are to gauge prejudice against the outcome of the trial: whether there is a reasonable probability of a different result at trial, not on appeal.").

Because McCoy failed to show a reasonable probability that the result of his trial would have been different had defense counsel objected to the order of the lesser included offenses, in the jury instructions and on the verdict form, the state court reasonably determined that *Strickland*'s prejudice prong was not satisfied. *See Strickland*, 466 U.S. at 694; *Richter*, 562 U.S. at 112 ("The likelihood of a different result must be substantial, not just conceivable."). McCoy thus is not entitled to habeas relief on Ground Two.

### C.     Ground Three:  "The Florida Supreme Court abused its discretion by discharging jurisdiction pursuant to the 14th Amendment due process clause."

McCoy contends the Florida Supreme Court violated his federal due process rights by failing to "straighten out the conflict" between the First DCA's decision in

his direct appeal and the Fifth DCA's decision in *Thomas v. State*, 91 So. 3d 880

(Fla. 5th DCA 2012) (*see* ECF No. 1 at 8).

The State contends Ground Three is not cognizable on federal habeas because

it does not implicate the federal Constitution and instead is a question of purely state

law (ECF No. 12 at 46).   The State argues that Florida Supreme Court's alleged

violation of the state constitution, laws, and procedural rules provides no basis for

federal habeas corpus relief (*id.*).   The State additionally contends that even if

Ground Three was cognizable, it is without merit, because the Florida Supreme

Court's review was discretionary, meaning, the court had no obligation to rule on

the issue (*id.* at 46–47).   The State contends the Florida Supreme Court's

discretionary decision not to review McCoy's case was not contrary to or an

unreasonable application of clearly established federal law (*id.* at 48).

Federal habeas relief is available to correct only federal constitutional injury.

*See* 28 U.S.C. § 2254(a); *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) (holding

that errors that do not infringe upon a defendant's constitutional rights provide no

basis for federal habeas corpus relief); *Barclay v. Florida*, 463 U.S. 939, 958–59

(1983) ("Mere errors of state law are not the concern of this court . . . unless they

rise for some other reason to the level of a denial of rights protected by the United

States Constitution.") (citations omitted); *Branan v. Booth*, 861 F.2d 1507, 1508 (11th Cir.1988) ("[A] habeas petition grounded on issues of state law provides no basis for habeas relief."). "This limitation on federal habeas review is of equal force when a petition, which actually involves state law issues, is couched in terms of equal protection and due process." *Branan*, 861 F.2d at 1508 (citations omitted).

Despite McCoy's contention that the Florida Supreme Court's discretionary decision to discharge jurisdiction and dismiss review of the First DCA's decision violated his federal due process rights, the issue is purely one of state law and procedure. And even if Ground Three implicated a federal due process right, McCoy has not identified any United States Supreme Court case which held that the Fourteenth Amendment requires a state supreme court to review a criminal judgment under the circumstances presented in McCoy's case. In the absence of such precedent, it cannot be said that the Florida Supreme Court unreasonably applied clearly established federal law in McCoy's case. *See Woods v. Donald*, 575 U.S. 312, 317 (2015) ("Because none of our cases confront the specific question presented by this case, the state court's decision could not be contrary to any holding from this Court." (internal quotation marks and citation omitted)); *Wright v. Van Patten*, 552 U.S. 120, 125–26 (2008) ("Because our cases give no clear answer to

the question presented, let alone one in [the petitioner's] favor, it cannot be said that the state court unreasonably applied clearly established federal law." (internal quotation marks omitted)); *Schriro v. Landrigan*, 550 U.S. 465, 478 (2007) (holding that the state court did not unreasonably apply federal law because "we have never addressed a situation like this"); *Carey v. Musladin*, 549 U.S. 70, 77 (2006) ("Given the lack of holdings from this Court regarding the [issue presented by the petitioner]," the denial of relief by the state court "was not contrary to or an unreasonable application of clearly established federal law."). McCoy is not entitled to federal habeas relief on Ground Three.

IV.    CONCLUSION

McCoy failed satisfy § 2254(d) with respect to the state court's adjudication of the merits of Grounds One and Two. Ground Three presents purely an issue of state law, and even if it implicated the federal Constitution, McCoy has not demonstrated that the Florida Supreme Court's decision not to review his conviction was contrary to or an unreasonable application of clearly established federal law. Therefore, McCoy's § 2254 petition should be denied.

## V.    CERTIFICATE OF APPEALABILITY

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."  28 U.S.C. § 2254 Rule 11(a).  A timely notice of appeal must still be filed, even if the court issues a certificate of appealability.  28 U.S.C. § 2254 Rule 11(b).

"Section 2253(c) permits the issuance of a COA only where a petitioner has made a 'substantial showing of the denial of a constitutional right.'"  *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (quoting § 2253(c)(2)).  "At the COA stage, the only question is whether the applicant has shown that 'jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'"  *Buck v. Davis*, 137 S. Ct. 759, 773 (2017) (citing *Miller-El*, 537 U.S. at 327).  McCoy cannot make that showing with respect to any of his claims. Therefore, the undersigned recommends that the district court deny a certificate of appealability in its final order.

The second sentence of Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue." Thus, if there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is respectfully **RECOMMENDED**:

1.      That the petition for writ of habeas corpus (ECF No. 1) be **DENIED**.

2.      That a certificate of appealability be **DENIED**.

3.      That the clerk of court be directed to enter judgment accordingly and close this case.

At Pensacola, Florida, this 2<u>nd</u> day of August 2021.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M.  TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**

## <u>NOTICE TO THE PARTIES</u>

**Objections to these proposed findings and recommendations must be filed within fourteen days of the date of the Report and Recommendation.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only and does not control</u>.  An objecting party must serve a copy of the objections on all other parties.  A party who fails to object to the magistrate judge's findings or recommendations contained in a report and recommendation waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**